Filed 8/19/14  P. v. Porter CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JEREMY NELSON PORTER,<br><br>        Defendant and Appellant. | A135565<br><br>(Contra Costa County<br>Super. Ct. No. 05-100749-1) |

A jury convicted defendant Jeremy Nelson Porter of the second degree murder of Irma Flores, as well as illegal possession of a firearm by a felon, and an enhancement for using a firearm and causing great bodily injury or death.  The trial court found true the allegation Porter had a prior robbery conviction, and sentenced him to 60 years to life in prison.

On appeal, Porter contends:  (1) his trial counsel was prejudicially ineffective for failing to present a mental state defense, (2) the court erred by denying a mistrial and failing to instruct the jury sua sponte about shackling after jurors may have observed Porter in shackles and jail clothing in the courthouse hallway on one occasion, and (3) the court did not understand it had discretion to dismiss his prior conviction allegation.  We affirm.

1

# I. BACKGROUND[1]

On the night of March 25-26, 2010, Flores and her cousins, Christina and Stephanie, and their friends, Sandra, Anna, and Carla, were returning from a club in Bay Point to their Richmond homes in a van driven by Christina. They left the club around 1:30 a.m. on March 26. During the approximately two and one-half hours they spent at the club, Flores received several calls (which she did not answer) from her boyfriend Jorge Ponce, with whom she had a "sketchy" or "rough" relationship.

While they were stopped at a stoplight in Richmond at approximately 2:00 a.m., a Buick driven by Porter pulled up to the right side of Christina's van. Porter and his passenger began talking to Flores and the other women in the van. Christina drove away, but Porter followed. Christina drove around the block, thought she had lost Porter, and then stopped at Sandra's house, where Sandra, Anna, and Flores got out. Flores told her friends she did not want to return to her own apartment because her boyfriend was there.

As Christina was driving away from Sandra's house, Porter pulled up to the house in the Buick. Sandra and Anna went into the house; Flores walked over to Porter's car and began talking with him. Flores later came into the house and asked Sandra to dial Porter's cell phone number because he had misplaced his phone. Sandra used her sister's cell phone to call Porter, and this number was later found stored in Porter's phone. After Porter found his phone, Sandra went back inside, and Flores stayed outside with Porter.

Flores later came inside again and talked to Sandra. Flores was crying and said her boyfriend was going to hit her because she had gone out. Sandra offered to let Flores sleep at her house, but Flores went back outside. Sandra went outside and saw Flores and Porter hugging and kissing. Flores told Sandra that she was going to leave with Porter. After failing to convince Flores to stay with her, Sandra went inside. Sandra heard the doors of the Buick close and the engine start.

---

[1] We provide additional background facts in the sections of this opinion addressing Porter's arguments on appeal.

Later that morning, around 7:00 a.m., a substitute teacher on her way to school discovered Flores's body on a sidewalk. Flores had been shot twice in the face, once in the forehead and once on the right side of her nose.

Richmond Police Officer Steve Harris, an expert in crime scene investigations, examined the scene that morning. Based on the blood spatter on the curb and on Flores's clothing, the broken car glass found at the scene, and the positioning of Flores's body, Harris concluded Flores was shot while sitting inside a car at that location and was then dragged outside. Harris located a bullet about six feet from Flores's body. The flattened tip of the bullet was consistent with hitting a glass window.

At the time of Flores's death in March 2010, Porter was in a dating relationship with Taquoise Newberry. Newberry testified pursuant to a use immunity agreement. Newberry stated she and Porter purchased a Tec-9 firearm a few weeks before Flores was killed.

Newberry testified that, around 4:30 a.m. on March 26, 2010, the morning Flores was killed, Porter called Newberry and said repeatedly, "I'm sorry, I'm sorry, I fucked up." Porter drove to the motel in Oakland where he and Newberry were staying. Newberry saw that the passenger side window of Porter's Buick was gone and there was blood all over the car. Porter told Newberry he was in the car that night with a woman he had met (Flores), who did not want to get out of the car because she was afraid of her boyfriend. Porter said he was not worried about her boyfriend because he had a gun, which he showed to Flores. Porter told Newberry the gun did not have the clip in, and he pointed the gun at Flores and pulled the trigger. Porter said there must have been a round in the chamber, because he fired one bullet into Flores's face or head. Porter said the shooting was an accident. Porter told Newberry he took Flores's body out of the car and laid it on the ground.

Newberry and Porter switched to a different room at the motel in case someone came to look for Porter. They looked for the Tec-9 gun on the side of Interstate 580, where Porter had discarded it after the shooting. They initially could not find the gun, but

in a subsequent search Porter recovered it. Porter later sold the gun, after Newberry wiped it off with bleach to remove any fingerprints.

Newberry threw Porter's bloody clothes in a dumpster. In the Buick, she covered up the front seat and other bloody areas with sheets and T-shirts. Newberry later attempted to clean the car with bleach and other cleaning products.

Newberry wanted to burn the Buick, but Porter decided to scrap it instead. A few days after Flores was killed, Porter paid Maji Mosley, an automotive recycler, to scrap the car. Mosley towed the car to Schnitzer Steel in Oakland to be destroyed.

Newberry testified that, in the days after Porter killed Flores, Porter became more aggressive, drank more, and once tried to jump off the motel balcony. Worried by Porter's behavior, Newberry made an anonymous phone call to the Richmond Police Department on March 30, 2010, and stated the Buick was about to be destroyed. Police officers went to Schnitzer Steel and recovered the Buick before it could be demolished. A records check revealed Porter was the car's registered owner.

Officer Harris examined the Buick after it was retrieved from Schnitzer Steel. The front passenger side window was missing, and there was a bullet hole above the passenger side sun visor. There was blood on the center console and on the right front door panel, which had been removed. Harris also found a traffic ticket and other paperwork in Porter's name, as well as a spent nine-millimeter shell casing.

DNA testing of blood found inside Porter's car revealed a DNA profile matching Flores's profile. A bullet fragment found at the scene also had Flores's DNA on it.

In early April 2010, Newberry made additional calls to the Richmond Police Department and provided more information, including identifying Porter as a suspect. Newberry told the police Porter had told her he shot Flores accidentally; Porter felt bad about what had happened and had nightmares about it; but he would not come forward because he did not think anyone would believe the shooting was an accident.

Police arrested Porter on April 8, 2010. Officers searched a black Monte Carlo car parked in front of the apartment where Porter was arrested; they found a spent nine-millimeter shell casing in the car.

4

Phone records showed Flores texted her boyfriend Jorge Ponce several times between 3:03 a.m. and 4:17 a.m. on the night she was killed, asking him to pick her up.

## II. DISCUSSION

### A. New Trial Motion

#### 1. Background

The jury acquitted Porter of first degree murder, but convicted him of second degree murder. Porter's trial counsel then filed a motion for a new trial on the ground he provided ineffective assistance by failing to investigate potential defenses based on Porter's mental illness and substance abuse. In a declaration, trial counsel stated that, on at least two occasions prior to trial, Porter asked counsel how drug and/or alcohol intoxication might affect the case, but on each occasion their conversation shifted before counsel answered this question. Counsel stated that, prior to trial, he did not investigate Porter's mental health or substance abuse history. During trial, on a day when Porter became "agitated by new evidence," Porter's mother informed counsel that Porter had a significant history of mental health problems. Counsel stated he did not investigate that issue during the remainder of the trial.

After trial, counsel had Porter evaluated by forensic psychologist John Podboy, and he submitted Dr. Podboy's report in support of the new trial motion. In his report, Dr. Podboy chronicled Porter's difficult childhood, behavioral problems, substance use and mental health history. Dr. Podboy diagnosed Porter as having several conditions, including antisocial personality disorder, bipolar disorder (mixed with psychotic features), "disassociative fugue" (involving outbursts or episodes during which he took actions that he later could not recall), posttraumatic stress disorder, alcohol abuse and polysubstance abuse. Dr. Podboy stated he believed "it would have been important to investigate Mr. Porter's functioning at the time of the crime for which he has been convicted. In particular, to investigate his ability to perceive his environment and respond appropriately to it. He has no recollection of much of what occurred at the time. In many respects, his psychological functioning at that time is consistent with what he experienced so often during his life; that is, manifesting these fugue-like disassociative

5

states and emotional extremes." Dr. Podboy did not provide more specific information or opinions about Porter's conduct or mental functioning on the night of the crime.

After a hearing, the trial court denied the new trial motion. The court found counsel was thoroughly prepared to try the case and represented Porter zealously and effectively, including obtaining an acquittal on the first degree murder charge. As to counsel's claimed deficiency in not investigating and pursuing a defense based on Porter's mental illness or substance abuse, the court found counsel made a reasonable strategic decision to argue that someone other than Porter (such as Flores's boyfriend or the passenger in Porter's car) shot Flores, or that the shooting was accidental (consistent with Porter's statements to Newberry). These defenses were most likely to result in an acquittal, in part because the evidence did not disclose why Flores was shot or the circumstances of the shooting. A mental state defense, by contrast, "would require an admission that the defendant was the shooter and would at best result in conviction of a lesser offense." There "was no need to investigate the mental defense[] because it was a less attractive defense and less likely to result in an acquittal."

As to prejudice from counsel's claimed error, the court found Porter had not shown a reasonable probability that presentation of testimony from Dr. Podboy would have led to a more favorable result. The court found there was nothing in Dr. Podboy's report showing that the diagnoses and problems he described would have prevented Porter from forming the intent to kill Flores. The court noted the report did show Porter's psychological problems "caused him to act out, behave badly [and] would support an argument that he is an antisocial individual." As a result, the information in the report "would have been potentially as harmful to the defendant as helpful because the primary thrust of the testimony would have been that the defendant chooses to behave badly."

*2. Analysis*

Ineffective assistance of counsel, if proven, is a valid, nonstatutory ground for a new trial. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582–583.) Upon appeal from the denial of a new trial motion based on a claim of ineffective assistance or other denial of constitutional rights, we defer to the trial court's factual findings if supported by

6

substantial evidence, but we exercise de novo review over the ultimate issue of whether the defendant's constitutional rights were violated. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724–725.)

To establish a claim of ineffective assistance of counsel, a defendant must show (1) trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the defendant suffered prejudice, i.e., there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694 (*Strickland*); *People v. Carter* (2003) 30 Cal.4th 1166, 1211 (*Carter*).) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland,* at p. 694; *Carter,* at p. 1211.)

We conclude that, even assuming counsel was deficient for failing to investigate and present a mental state defense, Porter has not shown prejudice. It is not reasonably probable that, absent counsel's alleged error, Porter would have obtained a more favorable verdict. (See *Strickland, supra,* 466 U.S. at pp. 687–688, 694; *Carter, supra,* 30 Cal.4th at p. 1211.)

As noted, Porter was convicted of second degree murder. Murder is the unlawful killing of a human being with malice aforethought, which can be express or implied. (Pen. Code,[2] §§ 187, subd. (a), 188; *People v. Bryant* (2013) 56 Cal.4th 959, 964.) Express malice is the intent to unlawfully kill. (*People v. Perez* (2010) 50 Cal.4th 222, 233, fn. 7.) "Intent to kill is not a difficult mental state to achieve." (*In re Scott* (2003) 29 Cal.4th 783, 825.) Implied malice is a " 'conscious disregard for life.' " (*People v. Blakeley* (2000) 23 Cal.4th 82, 87.) Specifically, malice is implied "when a killing results from an intentional act, the natural consequences of which are dangerous to human life, and the act is deliberately performed with knowledge of the danger to, and with conscious disregard for, human life." (*People v. Cook* (2006) 39 Cal.4th 566, 596 (*Cook*).) Absent malice, a defendant may be guilty of involuntary manslaughter (a lesser

---

[2] All statutory references are to the Penal Code unless otherwise stated.

offense on which the court also instructed the jury). (§ 192, subd. (b); *People v. Butler* (2010) 187 Cal.App.4th 998, 1006 (*Butler*).) The required mental state for conviction of involuntary manslaughter is criminal negligence. (*Butler,* at p. 1007.) While implied malice murder requires the defendant subjectively appreciated the risk involved, involuntary manslaughter requires a showing a reasonable person would have been aware of the risk (an objective standard). (*Id.* at pp. 1008–1009; *People v. Evers* (1992) 10 Cal.App.4th 588, 596.)

Porter contends that, if Dr. Podboy had testified about Porter's psychological problems (consistent with the information in Dr. Podboy's report), there is a reasonable probability that one or more jurors would have concluded he unlawfully killed Flores without express or implied malice (i.e., without an intent to kill, and without conscious disregard for life) and therefore was only guilty of involuntary manslaughter.[3] We disagree. Based on what the evidence reveals about Porter's shooting of Flores,[4] there is no reasonable probability Dr. Podboy's testimony would have led to a different result on the question of whether Porter acted with the intent to kill or a conscious disregard for life, and therefore was guilty of second degree murder.[5]

The trial evidence strongly supports the conclusion Porter intended to kill Flores, or at the very least acted with conscious disregard for the risk his actions posed to her life. Porter shot Flores twice in the face, once in the forehead and once on the right side of her nose. Based on the gunpowder "stippling" around the wounds, the forensic pathologist who conducted the autopsy estimated the muzzle of the gun was between six

---

[3] In his opening appellate brief, Porter argues Dr. Podboy's testimony would have entitled him to an instruction on *voluntary* manslaughter and would have caused jurors to conclude he was guilty of that crime. Porter abandons this argument in his reply brief.

[4] The verdict reflects the jury found Porter was the person who shot and killed Flores. Porter does not contend Dr. Podboy's testimony would have altered that conclusion.

[5] To the extent psychological evidence might have been relevant to whether Porter acted with premeditation and deliberation, the failure to introduce such evidence did not prejudice Porter, because the jury acquitted him of first degree murder. (See § 189.)

inches and two feet from Flores's face when the gun was fired. As the trial court noted in ruling on the new trial motion, the location of the shots and the fact the gun was fired twice strongly support a conclusion the shooting was intentional. The gun that Porter likely used (i.e., the Tec-9 gun he and Taquoise Newberry bought in March 2010)[6] was a semiautomatic weapon, so firing two shots would require two pulls of the trigger. As the trial court also noted, Porter's efforts to cover up his involvement in the killing, such as by dragging Flores's body out of his car and onto the street, selling the gun, and attempting to dispose of his car by having it demolished, further support an inference the killing was intentional.

Evidence of Porter's familiarity with guns and his prior gun use further supports the conclusion he intended to kill Flores or acted with conscious disregard for her life. Taquoise Newberry testified that, during their relationship, she saw Porter with several guns, including a .38 revolver, the Tec-9, and a shotgun. A few times, Porter pointed the Tec-9 (without the clip of bullets in it) at Newberry and pulled the trigger. On one occasion, Porter fired a gun outside Newberry's grandmother's house because Newberry would not come out of the house.

On March 15, 2010 (less than two weeks before Flores's killing), police officers responded to a call to the apartment of Shorlensky Ford, who told the officers that she and Porter had been dating for about three weeks.[7] In the apartment, officers found a nine-millimeter pistol, a spent shotgun casing, and a hole in the wall (into the next apartment) that appeared to have been made by a shotgun blast. Ford told the officers Porter had held the pistol to her head and then pushed it into her mouth.

In light of Porter's familiarity with and use of guns, it is highly likely that even if a juror was not persuaded that Porter intended to kill Flores, the juror would have

[6] A criminalist from the county crime laboratory testified the two shell casings found at the crime scene were cycled in, and likely fired from, the same gun, possibly a Tec-9.

[7] The trial court admitted evidence of this incident pursuant to Evidence Code section 1101, subdivision (b), to show Porter's familiarity with guns (an issue relevant to Porter's claim he shot Flores accidentally) and to show his intent.

9

concluded Porter acted with implied malice, i.e., he was subjectively aware of the risks associated with handling, pointing and firing guns and acted with conscious disregard for Flores's life. (See *Cook, supra,* 39 Cal.4th at p. 596 [standard for implied malice]; *Butler, supra,* 187 Cal.App.4th at pp. 1008–1009 [same].)

It is not reasonably probable that anything in Dr. Podboy's testimony (based on the contents of his report) would have altered the conclusion Porter acted with express or implied malice and thus was guilty of murder. As the trial court noted, Dr. Podboy would not have been permitted to opine as to whether Porter acted with malice. (See § 29.) Moreover, evidence of mental health and substance abuse problems would not have been admissible to show Porter lacked the "capacity" to form a required mental state, but would have been admissible solely on the issue of whether or not Porter "actually formed" the mental state (see § 28, subd. (a)).

As to that issue, it is not likely Dr. Podboy's testimony would have made a difference. As noted, Dr. Podboy described Porter's history of behavioral problems, substance abuse and mental health issues, and diagnosed Porter as having various conditions, including antisocial personality disorder, bipolar disorder, disassociative fugue, posttraumatic stress disorder, alcohol abuse and polysubstance abuse. But Dr. Podboy did not provide specific information or opinions about Porter's conduct or mental functioning on the night of the crime. As the trial court noted, nothing in Dr. Podboy's report suggests the mental problems he diagnosed prevented Porter from forming the intent to kill, and the report provides "no correlation between" the diagnoses and Porter's "actual intent" on the night Flores was shot.

We note Dr. Podboy described Porter's history of "fugue-like disassociative states" involving outbursts he later could not recall, and Dr. Podboy stated generally that (when he assessed Porter in 2012, two years after the homicide) Porter reported "at best only [a] spotty recollection" of that time. But there is no evidence Porter shot Flores while experiencing a temporary disassociative state that he could not recall afterwards. To the contrary, after the incident, Porter recalled he had shot Flores, and he told Taquoise Newberry he had done so.

10

For the foregoing reasons, we conclude it is not reasonably probable that the information in Dr. Podboy's report would have altered the jurors' assessment of whether Porter actually formed the required mental state for second degree murder, i.e., the intent to kill or a conscious disregard for life. (See *In re Avena* (1996) 12 Cal.4th 694, 723–724 [counsel's failure to investigate defendant's drug use was not prejudicial because the evidence counsel failed to uncover only showed defendant's habitual drug use and did not show defendant was under the influence of drugs on the night the crimes occurred].)

*B. The Jurors' Potential Observation of Porter in Jail Clothing and Restraints*

*1. Background*

On the last day of trial, defense counsel told the court that Porter stated he had been led across the courtroom hallway that morning in his jail clothing in the presence of the jurors. Noting that Porter apparently was also shackled at the time, counsel moved for a mistrial. Defense counsel acknowledged the incident resulted from a "misunderstanding," and he stated the deputy who brought Porter to court "was unaware that he needed to be dressed this morning."

The court denied the mistrial motion, while acknowledging "[i]t is unfortunate that it occurred." The court explained the jail elevators are on the opposite side of the building, "so there is physically no way to get a defendant from the jail elevator to the courtroom here across the hall without walking through the hallway, which is a public hallway." The court stated the fact the jurors may have seen Porter in a jail outfit and handcuffed did little more than let the jurors know Porter was in custody, which the court did not believe would "come as a huge surprise" to jurors in a murder case. The court stated the best remedy would be to instruct the jurors (as the court had already stated it would do) that they must not consider Porter's custodial status for any purpose in deciding the case. The court offered to consider any other instructions or remedies proposed by the defense, but denied the mistrial motion. Defense counsel did not suggest any other instructions or remedies.

The court later instructed the jury with a variation of CALJIC No. 1.04, as follows: "The fact that the defendant may be in custody must not be considered by you

for any purpose. It is not evidence of guilt, and must not be considered by you as any evidence that he is more likely to be guilty than not guilty. You must not speculate as to why he may be in custody. In determining the issues in this case, disregard this matter entirely." (See also CALCRIM No. 204.)

*2. Analysis*

Porter contends that, because jurors may have observed him in shackles and jail clothing as he was escorted to the courtroom on one occasion, the court erred by denying his mistrial motion and by failing to instruct the jury sua sponte that the shackles should have no bearing on the determination of his guilt. We disagree.

Our Supreme Court has held that "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People v. Duran* (1976) 16 Cal.3d 282, 288, fn. 5, 290–291 (*Duran*).) Similarly, a defendant may not be compelled, over objection, to stand trial before a jury while dressed in identifiable prison or jail clothing. (*Estelle v. Williams* (1976) 425 U.S. 501, 512–513; *People v. Taylor* (1982) 31 Cal.3d 488, 494, 495.) Visible physical restraints or prison clothing "may erode the presumption of innocence because they suggest to the jury that the defendant is a dangerous person who must be separated from the rest of the community." (*People v. Stevens* (2009) 47 Cal.4th 625, 632–633, 635 (*Stevens*).)

The above cases, however, address the situation in which a defendant appears in shackles or jail clothing before the jury throughout the trial. In that circumstance, the restraints or jail clothes serve as a "constant reminder of the defendant's custodial status" (*Stevens, supra,* 47 Cal.4th at p. 638), and thus may have " 'a continuing influence throughout the trial' " (*id.* at p. 639). In contrast, our Supreme Court has noted that brief observations by jurors of a defendant in shackles either inside or outside the courtroom "have generally been recognized as not constituting prejudicial error." (*Duran, supra*, 16 Cal.3d at p. 287, fn. 2; accord, *People v. Tuilaepa* (1992) 4 Cal.4th 569, 584; *People v. Jacobs* (1989) 210 Cal.App.3d 1135, 1141 (*Jacobs*).) We similarly conclude any brief observation of Porter in jail clothing in the hallway was not prejudicial. Seeing Porter in

the hallway in restraints and jail clothing while being taken to court on one occasion was not a "constant" reminder to the jury of his custodial status and was not likely to prejudice Porter. (Cf. *Stevens, supra,* 47 Cal.4th at p. 638 [" 'jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance' "].)

As to Porter's claim of instructional error, the Court of Appeal in *Jacobs* rejected the argument that a sua sponte instruction on restraints is required when jurors briefly observe a defendant being transported to court in restraints. (*Jacobs*, *supra*, 210 Cal.App.3d at pp. 1140–1141.) The *Jacobs* court reasoned that the rationale behind the sua sponte instruction requirement was "to alleviate the potential prejudice arising from the need to have visible, physical restraints on a defendant in a courtroom while in the jury's presence." (*Ibid.*) The court determined the rule did not apply when jurors may have viewed the defendant in restraints while he was being taken to or from the courtroom because it is customary to use restraints when transporting prisoners. (*Id.* at p. 1141.) The *Jacobs* court therefore held "that where one or more jurors or veniremen merely witnessed defendant being transported to or from the courtroom in visible restraints the trial court has no duty, sua sponte, to instruct the jury that the physical restraints on defendant have no bearing on the determination of guilt." (*Ibid.*) We agree with the *Jacobs* court. The trial court did not have a sua sponte obligation to give an instruction that specifically mentioned restraints (such as CALJIC No. 1.04).[8] The variation of this instruction given by the trial court, which instructed the jury to disregard Porter's custodial status, was sufficient to prevent any potential prejudice.[9] (See *People*

---

[8] CALJIC No. 1.04 states: "The fact that physical restraints have been placed on defendant [_____] must not be considered by you for any purpose. They are not evidence of guilt, and must not be considered by you as any evidence that [he] [she] is more likely to be guilty than not guilty. You must not speculate as to why restraints have been used. In determining the issues in this case, disregard this matter entirely." (See also CALCRIM No. 204.)

[9] In his reply brief, Porter suggests he may have suffered prejudice because the jurors' potential observation of him in restraints and jail clothing occurred "at a very crucial time in the trial," i.e., "immediately before the court's instructions to the jury and

*v. Ross* (1967) 67 Cal.2d 64, 72, revd. on other grounds *sub. nom. Ross v. California* (1968) 391 U.S. 470 [bringing defendant handcuffed into courtroom in jury's presence had "no harmful effect . . . since the jury knew defendant was in custody"].)

Because the jurors' potential brief observation of Porter in restraints and jail clothing outside the courtroom was not likely to have created any significant prejudice, and because the court's custody instruction was sufficient to alleviate any potential prejudice, the court did not abuse its discretion by denying Porter's motion for a mistrial.[10] (See *People v. Maury* (2003) 30 Cal.4th 342, 434 [denial of mistrial motion is reviewed under deferential abuse of discretion standard].)

## C. Sentencing

Porter contends the trial court did not understand it had discretion to dismiss his prior conviction allegation; he bases this argument on the trial court's statement that "[b]ased on the law that I'm required to impose in this case, on Count 1, a violation of Penal Code Section 187, second degree murder of Irma Flores, on March 26th, 2010, as enhanced by his prior strike conviction pursuant to Penal Code Section . . . 667(b) through (i), I sentence Mr. Porter to 30 years to life in state prison."[11] We conclude Porter forfeited any argument as to whether the court did not exercise its discretion (or abused that discretion) in failing to strike his prior conviction.

---

closing arguments, and on the day the jurors began their deliberations." But, in our view, the timing of the incident does not assist Porter. To the contrary, the fact the jurors' potential observation of Porter was followed very shortly by the court's instructions, including the instruction to disregard Porter's custodial status, further reduces the risk of any prejudice.

[10] Since Porter has not shown the court erred, we need not address the parties' arguments as to whether any error was harmless.

[11] The sentence for the second degree murder conviction was 15 years to life (§ 190, subd. (a)); pursuant to the three strikes law, the sentence was doubled to 30 years to life due to Porter's prior strike conviction (§§ 667, subd. (e)(1), 1170.12, subd. (c)(1)). The court also imposed: (1) a consecutive term of 25 years to life for the firearm use enhancement (§ 12022.53, subd. (d)), (2) a consecutive five-year term for a prior serious felony conviction (§ 667, subd. (a)(1)), and (3) a concurrent four-year term for the firearm possession conviction, for an aggregate sentence of 60 years to life.

Pursuant to Penal Code section 1385, subdivision (a), "[t]he judge or magistrate may, either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed." " '[Under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*),] a trial court may strike or vacate an allegation or finding under the Three Strikes law that a defendant has previously been convicted of a serious and/or violent felony, on its own motion, "in furtherance of justice" pursuant to . . . section 1385(a).' " (*People v. Carmony* (2004) 33 Cal.4th 367, 373 (*Carmony*).) Our Supreme Court has stated: "A defendant has no right to make a motion, and the trial court has no obligation to make a ruling, under section 1385. But he or she does have the right to 'invite the court to exercise its power by an application to strike a count or allegation of an accusatory pleading, and the court must consider evidence offered by the defendant in support of his assertion that the dismissal would be in furtherance of justice.' " (*Carmony, supra,* 33 Cal.4th at p. 375.) "And '[w]hen the balance falls clearly in favor of the defendant, a trial court not only may *but should* exercise the powers granted to him by the Legislature and grant a dismissal in the interests of justice.' [Citation.] Nonetheless, any failure on the part of a defendant to invite the court to dismiss under [Penal Code] section 1385 following *Romero* waives or forfeits his or her right to raise the issue on appeal." (*Carmony,* at pp. 375–376; see *People v. Scott* (1994) 9 Cal.4th 331, 356 ["complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal"].) A court's failure to dismiss or strike a prior conviction allegation is subject to review under the deferential abuse of discretion standard. (*Carmony,* at pp. 373–374.)

Porter forfeited the right to raise any appellate issue as to whether the trial court exercised its discretion (or abused its discretion) in failing to strike his prior conviction. In his written sentencing memorandum, Porter asserted generally that the court had discretion not to double the sentence for the murder conviction and asked the court to impose the resulting "minimum" sentence of 45 years to life, but he did not ask the court to strike his prior conviction and did not cite section 1385 or *Romero*. At the sentencing

15

hearing, defense counsel again stated 45 years to life was the "minimum" sentence (although the court "could add another 15 years" on the murder charge), but counsel again did not ask the court to strike Porter's prior conviction and did not refer to section 1385 or *Romero*. Finally, after the trial court discussed aggravating and mitigating factors relevant to sentencing and announced its sentence, defense counsel did not suggest the court had failed to rule on any request under *Romero* to strike Porter's prior conviction, and counsel did not ask the court to rule explicitly on that point. Because Porter did not expressly ask the court to strike his prior conviction under section 1385 and *Romero*, and then did not ask the court to rule explicitly on that issue, he forfeited any claim on appeal that the trial court did not understand it had discretion to strike the prior conviction, or abused its discretion by failing to strike the conviction.

We therefore consider Porter's claim his trial counsel provided ineffective assistance by failing to request that the court strike his prior conviction under section 1385 and *Romero*. This argument fails because Porter has not shown he was prejudiced by his counsel's not raising section 1385 and *Romero*. When a defendant asks the court to strike a prior conviction under section 1385, the court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161 (*Williams*).) Based on the appellate record, there is no reasonable probability that the trial court, applying these standards, would have struck Porter's prior conviction had counsel raised the issue.

At the sentencing hearing, after hearing argument from the parties, the court discussed the aggravating and mitigating factors set forth in California Rules of Court,

16

rules 4.421 and 4.423.[12]  The court found Porter's crime involved great violence and a high degree of callousness, i.e., he shot Flores twice in the face at close range.  The court stated:  "I can only imagine that the victim must have been looking straight at the defendant when that occurred, and to look someone in the eyes and shoot them twice in the face, in my view, is the height of callousness."  The court found Flores was vulnerable because she was intoxicated and was attracted to Porter; she "undoubtedly let her guard down and it resulted in her death."  The court also found Porter took advantage of a position of trust; his conduct posed a serious danger to society; and his prior convictions and juvenile adjudications were "lengthy and have increasing seriousness."  The court noted Porter was on felony probation for robbery when he murdered Flores, and "his performance on every juvenile adjudication, probation and [parole] he has been placed on have been consistently abysmal."  In mitigation, the court considered Dr. Podboy's report describing Porter's mental health issues, and Porter's expression of remorse to Taquoise Newberry after the murder.[13]

The court stated that, although the parties had described the crime as a "tragedy," the court did not find "any contribution to the tragedy by Ms. Flores other than having a good time with her friends and being attracted to a person.  Any of those are not in any sense faults of hers, but the conduct here is entirely the responsibility of Mr. Porter.  It was his choice to carry a firearm that evening.  And it was his choice to shoot her in the face twice.  So the tragedy is undoubtedly affecting both families, but the tragedy is on the shoulder of Mr. Porter and Mr. Porter alone."

Based on the trial court's discussion and conclusions about the circumstances of Porter's present crime and his background, character and prospects (two of the three factors relevant to the section 1385 determination, see *Williams, supra,* 17 Cal.4th at

---

[12] These rules apply when a sentencing court imposes a determinate sentence for a felony (see § 1170, subd. (b); Cal. Rules of Court, rules 4.403, 4.420(a)-(b), 4.421, 4.423), as the court did in connection with the firearm possession conviction.

[13] Porter did not address the court at sentencing and did not discuss the case with the probation officer.

17

p. 161), we conclude that on this record there is no reasonable probability the court would have struck the prior conviction had defense counsel raised the issue.[14] In reaching this conclusion, we note the three strikes law "creates a strong presumption that any sentence that conforms to these sentencing norms [i.e., the norms established by the three strikes law] is both rational and proper" (*Carmony, supra,* 33 Cal.4th at p. 378), and striking a prior conviction is appropriate only in extraordinary circumstances (*ibid.*). Porter has not shown a reasonable probability that the trial court, if faced with an explicit request under section 1385, would have found this to be such an extraordinary case.

### D. *Cumulative Impact of Alleged Errors*

Porter contends the cumulative impact of the errors alleged above requires reversal. (See *People v. Hill* (1998) 17 Cal.4th 800, 844.) We disagree. We have concluded the court did not err in connection with the jurors' potential observation of Porter in jail clothing and shackles in the courthouse hallway. The two remaining asserted errors (the failure to present a mental state defense at trial, and the failure to explicitly request dismissal of Porter's prior conviction at sentencing) occurred during different phases of the proceedings, and did not have a cumulative prejudicial impact on either the verdict or the sentence. Counsel's alleged *postverdict* failure in connection with sentencing could not have contributed to any cumulative prejudice affecting the verdict. Similarly, counsel's alleged failure to present mental state information *at trial* did not contribute to any cumulative prejudice at sentencing; the mental state information Porter contends counsel should have presented at trial was considered by the court at sentencing.

## III. DISPOSITION

The judgment is affirmed.

---

[14] Porter does not contend on appeal that the only *Williams* factor not expressly discussed by the court (i.e., the circumstances of Porter's prior robbery conviction, see *Williams, supra,* 17 Cal.4th at p. 161) would have significantly affected the court's decision under section 1385. Porter instead argues the court should have given more weight to his difficult background and mental health issues, factors the court expressly stated it had considered.

_____
                                                    Becton, J.*

We concur:


_____
  Margulies, Acting P.J.


_____
  Banke, J.


* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice
pursuant to article VI, section 6 of the California Constitution.